# EXHIBIT A

# DIETARY SUPPLEMENTS:







## AN ADVERTISING GUIDE FOR INDUSTRY



# TABLE OF CONTENTS

## I  INTRODUCTION                                                                    1

## II  APPLICATION OF FTC LAW TO DIETARY SUPPLEMENT ADVERTISING      3

### A.  Identifying Claims and Interpreting Ad Meaning                              3

1. Identifying Express and Implied Claims ..................................................... 3
2. When to Disclose Qualifying Information ................................................... 5
3. Clear and Prominent Disclosure .............................................................. 6

### B.  Substantiating Claims                                                        8

Overview ....................................................................................................... 8
1. Ads that Refer to a Specific Level of Support ........................................... 9
2. The Amount and Type of Evidence ......................................................... 10
3. The Quality of the Evidence ................................................................... 12
4. The Totality of the Evidence .................................................................. 14
5. The Relevance to the Evidence to the Specific Claim ............................ 16

### C.  Other Issues Relating to Dietary Supplement Advertising                    18

1. Claims based on Consumer Testimonials and Expert Endorsements ......... 18
2. Claims based on Traditional Use ............................................................ 20
3. Use of the DSHEA Disclaimer in Advertising ......................................... 23
4. Third Party Literature ............................................................................ 24

## III  CONCLUSION                                                                   25

End Notes                                                                            26

**I**

# INTRODUCTION

The dietary supplement industry is a dynamic one.  Scientific research on the associations between supplements and health is accumulating rapidly.  The number of products — and the variety of uses for which they are promoted — have increased significantly in the last few years.  The role of the Federal Trade Commission, which enforces laws outlawing "unfair or deceptive acts or practices," is to ensure that consumers get accurate information about dietary supplements so that they can make informed decisions about these products.[1]

The Federal Trade Commission (FTC) and the Food and Drug Administration (FDA) work together under a long-standing liaison agreement governing the division of responsibilities between the two agencies.  As applied to dietary supplements, the FDA has primary responsibility for claims on product labeling, including packaging, inserts, and other promotional materials distributed at the point of sale.  The FTC has primary responsibility for claims in advertising, including print and broadcast ads, infomercials, catalogs, and similar direct marketing materials.  Marketing on the Internet is subject to regulation in the same fashion as promotions through any other media.  Because of their shared jurisdiction, the two agencies work closely to ensure that their enforcement efforts are consistent to the fullest extent feasible.

In 1994, the Dietary Supplements Health and Education Act (DSHEA) significantly changed the FDA's role in regulating supplement labeling.[2]  These claims are commonly referred to as "structure/function" claims.[3]  Although DSHEA does not directly apply to advertising, it has generated many questions about the FTC's approach to dietary supplement advertising.  The answer to these questions is that advertising for any product — including dietary supplements — must be truthful, not misleading, and substantiated.  Given the dramatic increase in the volume and variety of dietary supplement advertising in recent years, FTC staff is issuing this guide to clarify how long-standing FTC policies and enforcement practices relate to dietary supplement advertising.



The FTC's  approach to supplement advertising is best illustrated by its Enforcement Policy Statement on Food Advertising (Food Policy Statement).  Although the Food Policy Statement does not specifically refer to supplements, the principles underlying the FTC's regulation of health claims in food advertising are relevant to the agency's approach to health claims in supplement advertising.  In general, the FTC gives great deference to an FDA determination of whether there is adequate support for a health claim.  Furthermore, the FTC and the FDA will generally arrive at the same conclusion when evaluating unqualified health claims.  As the Food Policy Statement notes, however, there may

**1**

be certain limited instances when a carefully qualified health claim in advertising may be permissible under FTC law, in circumstances where it has not been authorized for labeling. However, supplement marketers are cautioned that the FTC will require both strong scientific support and careful presentation for such claims.[5]

Supplement marketers should ensure that anyone involved in promoting products is familiar with basic FTC advertising principles.  The FTC has taken action not just against supplement manufacturers, but also, in appropriate circumstances, against ad agencies, distributors, retailers, catalog companies, infomercial producers and others involved in deceptive promotions.  *Therefore, all parties who participate directly or indirectly in the marketing of dietary supplements have an obligation to make sure that claims are presented truthfully and to check the adequacy of the support behind those claims.*

**2**

**II**

# APPLICATION OF FTC LAW TO DIETARY SUPPLEMENT ADVERTISING

The FTC's truth-in-advertising law can be boiled down to two common-sense propositions:

1) advertising must be truthful and not misleading; and
2) before disseminating an ad, advertisers must have adequate substantiation for all objective product claims.[6]

A deceptive ad is one that contains a misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances to their detriment. The FTC's substantiation standard is a flexible one that depends on many factors. When evaluating claims about the efficacy and safety of foods, dietary supplements and drugs, the FTC has typically applied a substantiation standard of competent and reliable scientific evidence.

To determine whether an ad complies with FTC law, it is first necessary to identify all express and implied claims that the ad conveys to consumers. Once the claims are identified, the scientific evidence is assessed to determine whether there is adequate support for those claims. The following sections describe this two-step process with examples illustrating how principles of ad interpretation and substantiation apply in the context of dietary supplement advertising. The examples have been simplified to illustrate one or two specific points. Therefore, advertisers should use these examples as general guidance only.[7]

## A. Identifying Claims and Interpreting Ad Meaning

### 1. Identifying Express and Implied Claims

The first step in evaluating the truthfulness and accuracy of advertising is to identify all express and implied claims an ad conveys to consumers. Advertisers must make sure that whatever they say expressly in an ad is accurate. Often, however, an ad conveys other claims beyond those expressly stated. Under FTC law, an advertiser is equally responsible for the accuracy of claims suggested or implied by the ad. Advertisers cannot suggest claims that they could not make directly.

When identifying claims, advertisers should not focus just on individual phrases or statements, but rather should consider the ad as a whole, assessing the "net impression" conveyed by all elements of the ad, including the text, product name, and depictions. When an ad lends itself to more than one reasonable interpretation, the advertiser is responsible for substantiating each

**3**

interpretation.  Copy tests, or other evidence of how consumers actually interpret an ad, can be valuable.  In many cases, however, the implications of the ad are clear enough to determine the existence of  the claim by examining the ad alone, without extrinsic evidence.

### Example 1

An advertisement claims that "university studies prove" that a mineral supplement can improve athletic performance.  The advertiser has expressly stated the level of support for the claimed benefit and is therefore responsible for having "university studies" that document the advertised benefit.  Furthermore, the implied reference to scientific evidence likely conveys to consumers the implied claim that the studies are methodologically sound.

### Example 2

An advertisement for a vitamin supplement claims that 90% of cardiologists regularly take the product.  In addition to the literal claim about the percentage of cardiologists who use the product, the ad likely conveys an implied claim that the product offers some benefit for the heart.  Therefore, the advertiser must have adequate support for both representations.

Depending on how it is phrased, or the context in which it is presented, a statement about a product's effect on a normal "structure or function" of the body may also convey to consumers an implied claim that the product is beneficial for the treatment of a disease.  If elements of the ad imply that the product also provides a disease benefit, the advertiser must be able to substantiate the implied disease claim even if the ad contains no express reference to disease.

### Example 3

An ad for an herbal supplement makes the claim that the product boosts the immune system to help maintain a healthy nose and throat during the winter season.  The ad features the product name "Cold Away" and includes images of people sneezing and coughing.  The various elements of the ad — the product name, the depictions of cold sufferers, and the reference to nose and throat health during the winter season — likely convey to consumers that the product helps prevent colds. Therefore, the advertiser must be able to substantiate

**4**

that claim.  Even without the product name and images, the reference to nose and throat health during the winter season may still convey a cold prevention claim.

### Example 4

An ad for a dietary supplement called "Arthricure" claims that the product maintains joint health and mobility into old age.  The "before" picture shows an elderly women using a walker.  The "after" picture shows her dancing with her husband.  The images and product name likely convey implied claims that the product is effective in the treatment of the symptoms of arthritis, and may also imply that the product can cure or mitigate the disease.  The advertiser must be able to substantiate these implied claims.

## 2. When to Disclose Qualifying Information

An advertisement can also be deceptive because of what it fails to say.  Section 15 of the FTC Act requires advertisers to disclose information if it is material in light of representations made or suggested by the ad, or material considering how consumers would customarily use the product.  Thus, if an ad would be misleading without certain qualifying information, that information must be disclosed.  For example, advertisers should disclose information relevant to the limited applicability of an advertised benefit.  Similarly, advertising that makes either an express or implied safety representation should include information about any significant safety risks.  Even in the absence of affirmative safety representations, advertisers may need to inform consumers of significant safety concerns relating to the use of their product.

### Example 5

An advertisement for a multi-vitamin/mineral supplement claims that the product can eliminate a specific mineral deficiency that results in feelings of fatigue.  In fact, less than 2% of the general population to which the ad is targeted suffers from this deficiency. The advertiser should disclose this fact so that consumers will understand that only the small percentage of people who suffer from the actual mineral deficiency are likely to experience any reduction in fatigue from using the product.

5

### *Example 6*

An advertiser for a weight loss supplement cites a placebo-controlled, double-blind clinical study as demonstrating that the product resulted in an average weight loss of fifteen pounds over an eight-week period. The weight loss for the test group is, in fact, significantly greater than for the control subjects. However, both the control and test subjects engaged in regular exercise and followed a restricted-calorie diet as part of the study regimen. The advertisement should make clear that users of the supplement must follow the same diet and exercise regimen to achieve the claimed weight loss results.

### *Example 7*

An advertiser claims that its herbal product is a natural pain reliever "without the side effects of over-the-counter pain relievers." However, there is substantial evidence that the product can cause nausea in some consumers when taken regularly. Because of the reference to the side effects of other pain relievers, consumers would likely understand this ad to mean that the herbal product posed no significant adverse effects. Therefore, the advertiser should disclose information about the adverse effects of the herbal product.

### *Example 8*

An herbal weight loss product contains an ingredient which, when consumed daily over an extended period, can result in a significant increase in blood pressure. Even in the absence of any representation about the product's safety, the advertiser should disclose this potentially serious risk.

## 3. Clear and Prominent Disclosure

When the disclosure of qualifying information is necessary to prevent an ad from being deceptive, that information should be presented clearly and prominently so that it is actually noticed and understood by consumers. A fine-print disclosure at the bottom of a print ad, a

**6**

disclaimer buried in a body of text, a brief video superscript in a television ad, or a disclaimer that is easily missed on an Internet web site, are not likely to be adequate.  To ensure that disclosures are effective, marketers should use clear language, avoid small type, place any qualifying information close to the claim being qualified, and avoid making inconsistent statements or distracting elements that could undercut or contradict the disclosure.  Because consumers are likely to be confused by ads that include inconsistent or contradictory information, disclosures need to be both direct and unambiguous to be effective.

### Example 9

A marketer promotes a supplement as a weight loss aid.  There is adequate substantiation to indicate that the product can contribute to weight loss when used in conjunction with a diet and exercise regimen.  The banner headline claims "LOSE 5 POUNDS IN 10 DAYS," the ad copy discusses how easy it is to lose weight by simply taking the product 3 times a day, and the ad includes dramatic before-and-after pictures.  A fine print disclosure at the bottom of the ad, "Restricted calorie diet and regular exercise required," would not be sufficiently prominent to qualify the banner headline and the overall impression that the product alone will cause weight loss.  The ad should be revised to remove any implication that the weight loss can be achieved by use of the product alone.  This revision, combined with a prominent indication of the need for diet and exercise, may be sufficient to qualify the claim.  However, if the research does not show that the product contributes anything to the weight loss effect caused by diet and exercise, it would be deceptive, even with a disclosure, to promote the product for weight loss.

Qualifying information should be sufficiently simple and clear that consumers not only notice it, but also understand its significance.  This can be a particular challenge when explaining complicated scientific concepts to a general audience, for example, if an advertiser wants to promote the effect of a supplement where there is an emerging body of science supporting that effect, but the evidence is insufficient to substantiate an unqualified claim. The advertiser should make sure consumers understand both the extent of scientific support and the existence of any significant contrary evidence. Vague qualifying terms — for example, that the product "may" have the claimed benefit or "helps" achieve the claimed benefit — are unlikely to be adequate.  Furthermore, advertisers should not make qualified claims where the studies they rely on are contrary to a stronger body of evidence.  In such instance, even a qualified claim could mislead consumers.

*Example 10*

A company has results from two studies suggesting that the main ingredient in its supplement helps to maintain healthy cholesterol levels.  There are, however, significant limitations to each of the studies and a better controlled study is necessary to confirm whether the effect is genuine.  The company makes a claim in advertising that "scientific studies show that our product may be effective in reducing cholesterol."  The use of the word "may" is not likely to be a sufficient disclaimer to convey the limitations of the science.  A disclosure that clearly describes the limitations of the research, in language consumers can easily understand, and states directly and unambiguously that additional research is necessary to confirm the preliminary results is more likely to be effective.  As discussed in the following section on substantiating claims, the extent to which studies support an unqualified claim will depend largely on what experts in the relevant field would consider to be adequate support.

## B. Substantiating Claims

In addition to conveying product claims clearly and accurately, marketers need to verify that there is adequate support for their claims.  Under FTC law, before disseminating an ad, advertisers must have a reasonable basis for all express and implied product claims.  What constitutes a reasonable basis depends greatly on what claims are being made, how they are presented in the context of the entire ad, and how they are qualified.  The FTC's standard for evaluating substantiation is sufficiently flexible to ensure that consumers have access to information about emerging areas of science.  At the same time, it is sufficiently rigorous to ensure that consumers can have confidence in the accuracy of information presented in advertising.  A number of factors determine the appropriate amount and type of substantiation, including:

- **The Type of Product.**  Generally, products related to consumer health or safety require a relatively high level of substantiation.

- **The Type of Claim.**  Claims that are difficult for consumers to assess on their own are held to a more exacting standard.  Examples include health claims that may be subject to a placebo effect or technical claims that consumers cannot readily verify for themselves.

- **The Benefits of a Truthful Claim** and **The Cost/Feasibility of Developing Substantiation for the Claim.** These factors are often weighed together to ensure that valuable product information is not withheld from consumers because the cost of developing substantiation is prohibitive. This does not mean, however, that an advertiser can make any claim it wishes without substantiation, simply because the cost of research is too high.

- **The Consequences of a False Claim.** This includes physical injury, for example, if a consumer relies on an unsubstantiated claim about the therapeutic benefit of a product and foregoes a proven treatment. Economic injury is also considered.

- **The Amount of Substantiation that Experts in the Field Believe is Reasonable.** In making this determination, the FTC gives great weight to accepted norms in the relevant fields of research and consults with experts from a wide variety of disciplines, including those with experience in botanicals and traditional medicines. Where there is an existing standard for substantiation developed by a government agency or other authoritative body, the FTC accords great deference to that standard.

The FTC typically requires claims about the efficacy or safety of dietary supplements to be supported with "competent and reliable scientific evidence," defined in FTC cases as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." This is the same standard the FTC applies to any industry making health-related claims. There is no fixed formula for the number or type of studies required or for more specific parameters like sample size and study duration. There are, however, a number of considerations to guide an advertiser in assessing the adequacy of the scientific support for a specific advertising claim.

## 1. Ads that Refer to a Specific Level of Support

If an advertiser asserts that it has a certain level of support for an advertised claim, it must be able to demonstrate that the assertion is accurate. Therefore, as a starting point, advertisers must have the level of support that they claim, expressly or by implication, to have.

*Example 11*

An ad for a supplement includes the statement "Scientists Now Agree!" in discussing the product's benefit. This statement likely conveys to consumers that the state of science supporting the benefit has reached the level of scientific consensus. Unless the advertiser possesses this level of evidence, the claim is not substantiated.

**9**

*Example 12*

An advertiser claims that its product has been "studied for years abroad" and is now the "subject of U.S. government-sponsored research."  In addition to the explicit claim that the product has been studied, such phrases likely convey to consumers an implied claim that there exists a substantial body of competently-conducted scientific research supporting the efficacy of the product.  The advertiser would be responsible for substantiating both claims.

## 2. The Amount and Type of Evidence

When no specific claim about the level of support is made, the evidence needed depends on the nature of the claim.  A guiding principle for determining the amount and type of evidence that will be sufficient is what experts in the relevant area of study would generally consider to be adequate.  The FTC will consider all forms of competent and reliable scientific research when evaluating substantiation.  As a general rule, well-controlled human clinical studies are the most reliable form of evidence.  Results obtained in animal and *in vitro* studies will also be examined, particularly where they are widely considered to be acceptable substitutes for human research or where human research is infeasible.  Although there is no requirement that a dietary supplement claim be supported by any specific number of studies, the replication of research results in an independently-conducted study adds to the weight of the evidence.  In most situations, the quality of studies will be more important than quantity.  When a clinical trial is not possible (e.g., in the case of a relationship between a nutrient and a condition that may take decades to develop), epidemiologic evidence may be an acceptable substitute for clinical data, especially when supported by other evidence, such as research explaining the biological mechanism underlying the claimed effect.

Anecdotal evidence about the individual experience of consumers is not sufficient to substantiate claims about the effects of a supplement.  Even if those experiences are genuine, they may be attributable to a placebo effect or other factors unrelated to the supplement.  Individual experiences are not a substitute for scientific research.[8]

*Example 13*

An advertiser relies on animal and *in vitro* studies to support a claim that its vitamin supplement is more easily absorbed into the bloodstream than other forms of the vitamin.  However, the animal research uses a species of animal that, unlike humans, is able to synthesize the vitamin, and the *in vitro* study uses a different formulation with a higher concentration of the

**10**

compound than the product being marketed.  In addition, human research is feasible and relatively inexpensive to conduct in light of the potential sales of the product and is the type of research generally accepted in this particular field of study.  The substantiation is likely to be inadequate in this case, both because there are significant methodological problems and because, in this particular instance, human research is both feasible and the accepted approach in the field.


### Example 14

A company wants to advertise its supplement as helpful in maintaining good vision into old age.  There have been two long-term, large-scale epidemiologic studies showing a strong association between life-long high consumption of the principal ingredient in the supplement and better vision in those over 70.  Experts have also discovered a plausible biological mechanism that might explain the effect.  A clinical intervention trial would be very difficult and costly to conduct.  Assuming that experts in the field generally consider epidemiological evidence to be adequate to support the potential for a protective effect, and assuming the absence of any stronger body of  contrary evidence, a claim that is qualified to accurately convey the nature and extent of the evidence would be permitted.


### Example 15

An advertisement for a supplement claims that the product will cause dramatic improvements in memory and describes the experiences of 10 people who obtained these results.  The descriptions of these anecdotal experiences are truthful, but the advertiser has no scientific substantiation for the effect of its product on memory and cannot explain why the product might produce such results.  The individual experiences are not adequate to substantiate the claim without confirming scientific research.

**11**

## 3. The Quality of the Evidence

In addition to the amount and type of evidence, the FTC will also examine the internal validity of each piece of evidence.  Where the claim is one that would require scientific support, the research should be conducted in a competent and reliable manner to yield meaningful results. The design, implementation, and results of each piece of research are important to assessing the adequacy of the substantiation.

There is no set protocol for how to conduct research that will be acceptable under the FTC substantiation doctrine. There are, however, some principles generally accepted in the scientific community to enhance the validity of test results.  For example, a study that is carefully controlled, with blinding of subjects and researchers, is likely to yield more reliable results.  A study of longer duration can provide better evidence that the claimed effect will persist and resolve potential safety questions.  Other aspects of the research results — such as evidence of a dose-response relationship (*i.e.*, the larger the dose, the greater the effect) or a recognized biological or chemical mechanism to explain the effect — are examples of factors that add weight to the findings.  Statistical significance of findings is also important.  A study that fails to show a statistically significant difference between test and control group may indicate that the measured effects are merely the result of placebo effect or chance.   The results should also translate into a meaningful benefit for consumers.  Some results that are statistically significant may still be so small that they would mean only a trivial effect on consumer health.

The nature and quality of the written report of the research are also important.  Research cannot be evaluated accurately on the basis of an abstract or an informal summary.  In contrast, although the FTC does not require that studies be published and will consider unpublished, proprietary research, the publication of a peer-reviewed study in a reputable journal indicates that the research has received some measure of scrutiny.  At the same time, advertisers should not rely simply on the fact that research is published as proof of the efficacy of a supplement.  Research may yield results that are of sufficient interest to the scientific community to warrant publication, but publication does not necessarily mean that such research is conclusive evidence of a substance's effect.  The FTC considers studies conducted in foreign countries as long as the design and implementation of the study are scientifically sound.[9]

### *Example 16*
An advertiser conducts a literature search and finds several abstracts summarizing research about the association between a nutrient and the ability to perform better on memory tests.  The advertiser relies on these summaries to support a claim that its supplement, which contains the same nutrient, aids memory. However, without looking carefully at the specifics of the study design, implementation, and results, there is

**12**

no way for an advertiser to ascertain whether the research substantiates the product claims.  (For example, did the research use a comparable formulation of the ingredient?  Was the study adequately controlled?  Did the study yield results that are statistically significant?)  The advertiser should carefully review the underlying science, with the assistance of an expert if necessary, before drafting advertising claims.

### Example 17

An advertiser makes an unqualified claim about the anti-clotting effect of a supplement that contains a compound extracted from fruit.  There are three studies supporting the effect and no contrary evidence.  One study consists of subjects tested over a one-week period, with no control group.  The second study is well-controlled, of longer duration, but shows only a slight effect that is not statistically significant.  The third study administers the compound through injection and shows a significant anti-clotting effect, but there is some question whether the compound would be absorbed into the bloodstream if administered orally.  Because the studies all have significant limitations, it would be difficult to draft even a carefully qualified claim that would  adequately convey to consumers the limited nature of the evidence.  The advertiser should not base a claim on these studies.

### Example 18

The marketer of an herbal supplement claims that its product promotes healthy vision and is approved in Germany for this purpose.  The product has been used extensively in Europe for years and has obtained approval by the German governmental authorities, through their monograph process, for use to improve vision in healthy people. The company has two abstracts of German trials that were the basis of the German monograph, showing that the ingredient significantly improved the vision of healthy  individuals in the test group over the placebo group.  Animal trials done by the company suggest a plausible mechanism to explain the

effect.  Although approval of the supplement under the German monograph suggests that the supplement is effective, advertisers should still examine the underlying research to confirm that it is relevant to the advertiser's product (for example, that the dosage and formulation are comparable) and to evaluate whether the studies are scientifically sound.  Advertisers should also examine any other research that exists, either supporting or contradicting the monograph, especially if it is not possible to identify and review the research on which the monograph is based.

## 4. The Totality of the Evidence

Studies cannot be evaluated in isolation.  The surrounding context of the scientific evidence is just as important as the internal validity of individual studies.  Advertisers should consider all relevant research relating to the claimed benefit of their supplement and should not focus only on research that supports the effect, while discounting research that does not.  Ideally, the studies relied on by an advertiser would be largely consistent with the surrounding body of evidence.  Wide variation in outcomes of studies and inconsistent or conflicting results will raise serious questions about the adequacy of an advertiser's substantiation.  Where there are inconsistencies in the evidence, it is important to examine whether there is a plausible explanation for those inconsistencies.  In some instances, for example, the differences in results are attributable to differences in dosage, the form of administration (e.g., oral or intravenous), the population tested, or other aspects of study methodology.  Advertisers should assess how relevant each piece of research is to the specific claim they wish to make, and also consider the relative strengths and weaknesses of each.  If a number of studies of different quality have been conducted on a specific topic, advertisers should look first to the results of the studies with more reliable methodologies.

The surrounding body of evidence will have a significant impact both on what type, amount and quality of evidence is required to substantiate a claim and on how that claim is presented — that is, how carefully the claim is qualified to reflect accurately the strength of the evidence.  If a stronger body of surrounding evidence runs contrary to a claimed effect, even a qualified claim is likely to be deceptive.

### *Example 19*
An advertiser wishes to make the claim that a supplement product will substantially reduce body fat. The advertiser has two controlled, double-blind studies showing a modest but statistically significant loss of fat at the end of a six-week period.  However, there is an equally well-controlled, blinded 12-week study showing

**14**

no statistically significant difference between test and control groups.  Assuming other aspects of methodology are similar, the studies taken together suggest that, if the product has any effect on body fat, it would be very small.  Given the totality of the evidence on the subject, the claim is likely to be unsubstantiated.

### Example 20

Advertisements for a fiber supplement make the claim that the product is "proven" to aid weight loss.  Although the company has two published, peer-reviewed studies showing a relationship between fiber and weight loss, neither of these studies used the same proportions of soluble and insoluble fiber or the same total amount of fiber as the supplement product.  There are numerous controlled, published human clinical studies, however, using the amount and type of fiber in the supplement product, that provide evidence that the product would not result in measurable weight loss.  The totality of the evidence does not support the "proven" claim and, given the stronger body of contrary evidence, even a qualified claim is likely to be deceptive.

### Example 21

An advertiser runs an ad in a magazine for retired people, claiming that its supplement product has been found effective in improving joint flexibility.  The company sponsored a 6-week study of its supplement, involving 50 subjects over the age of 65, to test the product's effect on improving flexibility.  The study was double-blinded and placebo-controlled and has been accepted for publication in a leading medical journal. The study showed dramatic, statistically significant increases in joint flexibility compared to placebo, based on objective measurements.  In addition, several large trials have been conducted by European researchers using a similar formulation and dose of the active ingredient in the supplement.  These trials also found statistically significant results. The advertiser reviewed the underlying European research and confirmed that it meets accepted research standards. The evidence as a whole likely substantiates the claim.

**15**

## 5. The Relevance of the Evidence to the Specific Claim

A common problem in substantiation of advertising claims is that an advertiser has valid studies, but the studies do not support the claim made in the ad.  Advertisers should make sure that the research on which they rely is not just internally valid, but also relevant to the specific product being promoted and to the specific benefit being advertised.  Therefore, advertisers should ask questions such as:  How does the dosage and formulation of the advertised product compare to what was used in the study?  Does the advertised product contain additional ingredients that might alter the effect of the ingredient in the study?  Is the advertised product administered in the same manner as the ingredient used in the study?  Does the study population reflect the characteristics and lifestyle of the population targeted by the ad?  If there are significant discrepancies between the research conditions and the real life use being promoted, advertisers need to evaluate whether it is appropriate to extrapolate from the research to the claimed effect.

In drafting ad copy, the advertiser should take care to make sure that the claims match the underlying support.  Claims that do not match the science, no matter how sound that science is, are likely to be unsubstantiated.  Advertising should not exaggerate the extent, nature, or permanence of the effects achieved in a study, and should not suggest greater scientific certainty than actually exists.  Although emerging science can sometimes be the basis for a carefully qualified claim, advertisers must make consumers aware of any significant limitations or inconsistencies in the scientific literature.

### *Example 22*

An ad for a supplement claims that a particular nutrient helps maintain healthy cholesterol levels.  There is a substantial body of epidemiologic evidence suggesting that foods high in that nutrient are associated with lower cholesterol levels.  There is no science, however, demonstrating a relationship between the specific nutrient and cholesterol, although it would be feasible to conduct such a study.  If there is a basis for believing that the health effect may be attributable to other components of the food, or to a combination of various components, a claim about the cholesterol maintenance benefits of the supplement product is likely not substantiated by this evidence.

### Example 23

A number of well-controlled clinical studies have been conducted to suggest that a mineral supplement can improve mental alertness and memory in subjects with significantly impaired blood circulation to the brain.  A claim suggesting that the supplement will improve memory or mental alertness in healthy adults may not be adequately substantiated by this evidence.  Advertisers should not rely on research based on a specific test population for claims targeted at the general population without first considering whether it is scientifically sound to make such extrapolations.

### Example 24

An advertiser wants to make claims that its combination herbal product helps increase alertness and energy safely and naturally.  The product contains two herbs known to have a central nervous system stimulant effect.  The advertiser compiles competent and reliable scientific research demonstrating that each of the herbs, individually, is safe and causes no significant side effects in the recommended dose.  This evidence may be inadequate to substantiate an unqualified safety claim.  Where there is reason to suspect that the combination of multiple ingredients might result in interactions that would alter the effect or safety of the individual ingredients, studies showing the effect of the individual ingredients may be insufficient to substantiate the safety of the multiple ingredient product.  In this example, the combination of two herbs with similar stimulant properties could produce a stronger cumulative stimulant effect that might present safety hazards.  A better approach would be to investigate the safety of the specific combination of ingredients contained in the product.

### Example 25

Several clinical trials have been done on a specific botanical extract showing consistently that the extract is effective for supporting the immune system.  The studied extract is a complex combination of many constituents and the active constituents that may produce the benefit are still unknown.  An advertiser wishes to cite this research in its advertising, as proof that its product will support the immune system.  The advertiser's product is made using a different extraction method of the same botanical.  An analysis of the extract reveals that it has a significantly different chemical profile from the studied extract.  The advertiser should not rely on these clinical trials alone as substantiation because the difference in extracts may result in significant differences in the two products' efficacy.

## C.  Other Issues Relating to Dietary Supplement Advertising

In addition to the basic principles of ad meaning and substantiation discussed above,  a number of other issues commonly arise in the context of dietary supplement advertising.  The following sections provide guidance on some of these issues including:  the use of consumer or expert endorsements in ads; advertising claims based on traditional uses of supplements; use of the DSHEA disclaimer in advertising; and the application to advertising of the DSHEA exemption for certain categories of publications, commonly referred to as "third party literature."

### 1. Claims Based on Consumer Testimonials or Expert Endorsements

An overall principle is that advertisers should not make claims either through consumer or expert endorsements that would be deceptive or could not be substantiated if made directly.[10] It is not enough that a testimonial represents the honest opinion of the endorser.  Under FTC law, advertisers must also have appropriate scientific evidence to back up the underlying claim.

Consumer testimonials raise additional concerns about which advertisers need to be aware.  Ads that include consumer testimonials about the efficacy or safety of a supplement product should be backed by adequate substantiation that the testimonial experience is representative of what consumers will generally achieve when using the product.  As discussed earlier, anecdotal evidence of a product's effect, based solely on the experiences of individual consumers, is generally insufficient to substantiate a claim.  Further, if the advertiser's substantiation does not demonstrate that the results are representative, then a clear and

**18**

conspicuous disclaimer is necessary.  The advertiser should either state what the generally expected results would be or indicate that the consumer should not expect to experience the attested results.  Vague disclaimers like "results may vary" are likely to be  insufficient.

### *Example 26*

An advertisement for a weight loss supplement features a before-and-after photograph of a woman and quotes her as saying that she lost 20 pounds in 8 weeks while using the supplement.  An asterisk next to the quotation references a disclaimer in fine print at the bottom of the ad that reads, "Results may vary."  The experience of the woman is accurately represented, but the separate, competent research demonstrating the efficacy of the supplement showed an average weight loss of only 6 pounds in 8 weeks.   Therefore, the disclosure does not adequately convey to consumers that they would likely see much less dramatic results.  The placement and size of the disclaimer is also insufficiently prominent to qualify the claim effectively.  One approach to adequate qualification of this testimonial would be to include a disclaimer immediately adjacent to the quote, in equal print size that says, "These results are not typical. Average weight loss achieved in clinical study was 6 pounds."

When an advertiser uses an expert endorser, it should make sure that the endorser has appropriate qualifications to be represented as an expert and has conducted an examination or testing of the product that would be generally recognized in the field as sufficient to support the endorsement.  In addition, whenever an expert or consumer endorser is used, the advertiser should disclose any material connection between the endorser and the advertiser of the product.  A material connection is one that would affect the weight or credibility of the endorsement, or put another way, a personal, financial, or similar connection that consumers would not reasonably expect.

### *Example 27*

An infomercial for a dietary supplement features an expert referred to as a "Doctor" and a "leading clinician in joint health" discussing the effect of a supplement product on the maintenance of healthy joints.  The expert is not licensed to practice medicine, but has a graduate degree and is a trained physical therapist, running a sports clinic.  The expert has not conducted

any review of the scientific literature on the active component of the supplement.  In return for appearing in the infomercial, she is given a paid position as an officer the company. The ad is likely to be deceptive for several reasons.  First, her qualifications as an expert have been overstated and she has not conducted sufficient examination of the product to support the endorsement.  In addition, her connection to the company is one that consumers might not expect and may affect the weight and credibility of her endorsement.  Even if she is adequately qualified and has conducted an adequate review of the product, her position as an officer of the company should be clearly disclosed.

### Example 28

A best-selling book about the benefits of a supplement product includes a footnote mentioning the most effective brand of the supplement, by name.  The manufacturer of the brand cited in the book has an exclusive promotional agreement with the author and has paid him to reference the product by name.  The manufacturer's ad touts the fact that its product is the only brand recommended in this best-selling book.  The ad is deceptive since it suggests a neutral endorsement when, in fact, the author has been paid by the manufacturer to promote the product.

## 2. Claims Based on Traditional Use

Claims based on historical or traditional use should be substantiated by confirming scientific evidence, or should be presented in such a way that consumers understand that the sole basis for the claim is a history of use of the product for a particular purpose.  A number of supplements, particularly botanical products, have a long history of use as traditional medicines in the United States or in other countries to treat certain conditions or symptoms. Several European countries have a separate regulatory approach to these traditional medicines, allowing manufacturers to make certain limited claims about their traditional use for treating certain health conditions.  Some countries also require accompanying disclosures about the fact that the product has not been scientifically established to be effective, as well as disclosures about potential adverse effects.  At this time there is no separate regulatory process for approval of claims for these traditional medicine products under DSHEA and FDA labeling rules.

**20**

In assessing claims based on traditional use, the FTC will look closely at consumer perceptions and specifically at whether consumers expect such claims to be backed by supporting scientific evidence. Advertising claims based solely on traditional use should be presented carefully to avoid the implication that the product has been scientifically evaluated for efficacy. The degree of qualification necessary to communicate the absence of scientific substantiation for a traditional use claim will depend in large part on consumer understanding of this category of products. As consumer awareness of and experience with "traditional use" supplements evolve, the extent and type of qualification necessary is also likely to change.



There are some situations, however, where traditional use evidence alone will be inadequate to substantiate a claim, even if that claim is carefully qualified to convey the limited nature of the support. In determining the level of substantiation necessary to substantiate a claim, the FTC assesses, among other things, the consequences of a false claim. Claims that, if unfounded, could present a substantial risk of injury to consumer health or safety will be held to a higher level of scientific proof. For that reason, an advertiser should not suggest, either directly or indirectly, that a supplement product will provide a disease benefit unless there is competent and reliable scientific evidence to substantiate that benefit. The FTC will closely scrutinize the scientific support for such claims, particularly where the claim could lead consumers to forego other treatments that have been validated by scientific evidence, or to self-medicate for potentially serious conditions without medical supervision.

The advertiser should also make sure that it can document the extent and manner of historical use and be careful not to overstate such use. As part of this inquiry, the advertiser should make sure that the product it is marketing is consistent with the product as traditionally administered. If there are significant differences between the traditional use product and the marketed product, in the form of administration, the formulation of ingredients, or the dose, a "traditional use" claim may not be appropriate.

### Example 29

The advertiser of an herbal supplement makes the claim, "Ancient folklore remedy used for centuries by Native Americans to aid digestion." The statement about traditional use is accurate and the supplement product is consistent with the formulation of the product as traditionally used. However, if, in the context of the ad, this statement suggests that there is scientific evidence demonstrating that the product is effective for aiding digestion, the advertiser would need to include a clear and prominent disclaimer about the absence of such evidence.

### Example 30

A supplement manufacturer wants to market an herbal product that has been used in the same formulation in China as a tonic for improving mental functions. The manufacturer prepares the product in a manner consistent with Chinese preparation methods. The ad claims, "Traditional Chinese Medicine — Used for Thousands of Years to Bring Mental Clarity and Improve Memory." The ad also contains language that clearly conveys that the efficacy of the product has not been confirmed by research, and that traditional use does not establish that the product will achieve the claimed results. The ad is likely to adequately convey the limited nature of support for the claim.

### Example 31

A supplement manufacturer markets a capsule containing a concentrated extract of a botanical product that has been used in its raw form in China to brew teas for increasing energy. The advertisement clearly conveys that the energy benefit is based on traditional use and has not been confirmed by scientific research. The ad may still be deceptive, however, because the concentrated extract is not consistent with the traditional use of the botanical in raw form to brew teas and may produce a significantly different effect.

### Example 32

A supplement ad claims that a supplement liquid mineral solution has been a popular American folk remedy since early pioneer days for shrinking tumors. The ad is likely to convey to consumers that the product is an effective treatment for cancer. There is no scientific support for this disease benefit. Because of the potential risks to consumers of taking a product that may or may not be effective to treat such a serious health condition, possibly without medical supervision, the advertiser should not make the claim.

**22**

## 3. Use of the DSHEA Disclaimer in Advertising

Under DSHEA, all statements of nutritional support for dietary supplements must be accompanied by a two-part disclaimer on the product label: that the statement has not been evaluated by FDA and that the product is not intended to "diagnose, treat, cure or prevent any disease." Although DSHEA does not apply to advertising, there are situations where such a disclosure is desirable in advertising as well as in labeling to prevent consumers from being misled about the nature of the product and the extent to which its efficacy and safety have been reviewed by regulatory authorities. For example, a disclosure may be necessary if the text or images in the ad lead consumers to believe that the product has undergone the kind of review for safety and efficacy that the FDA conducts on new drugs and has been found to be beneficial for the treatment of disease. Failure to correct those misperceptions may render the advertising deceptive.

At the same time, the inclusion of a DSHEA disclaimer or similar disclosure will not cure an otherwise deceptive ad, particularly where the deception concerns claims about the disease benefits of a product. In making references to DSHEA and FDA review, advertisers should also be careful not to mischaracterize the extent to which a product or claim has been reviewed or approved by the FDA. Compliance with the notification and disclaimer provisions of DSHEA does not constitute authorization of a claim by FDA and advertisers should not imply that FDA has specifically approved any claim on that basis.

### *Example 33*

A company markets a supplement for "maintaining joint flexibility." The product packaging is similar in color and design to a nonprescription drug used to treat joint pain associated with arthritis and the product name is similar to the drug counterpart. The ad includes statements urging consumers to "ask their pharmacist" and "accept no generic substitute." The various elements of the ad may lead consumers to believe that the supplement is, in fact, an approved drug, or may give consumers more general expectations that the product has been subjected to similar government review for safety and efficacy. A clear and prominent disclaimer may be necessary to indicate that the product has not been evaluated by FDA and is not an approved drug product.

### Example 34

An advertisement for an herbal supplement includes strong, unqualified claims that the product will effectively treat or prevent diabetes, heart disease, and various circulatory ailments.  The advertiser does not have adequate substantiation for this claim, but includes the DSHEA disclaimer prominently in the ad.  In face of the strong contradictory message in the ad, the inclusion of the DSHEA disclaimer is not likely to negate the explicit disease claims made in the ad, and will not cure the fact that the claims are not substantiated.

### Example 35

A dietary supplement advertisement makes a number of claims about the benefits of its product for supporting various body functions.  The ad also includes the statement, "Complies with FDA notification procedures of the Dietary Supplement Health and Education Act." This statement may suggest to consumers that FDA has authorized the claims made in the ad or that it has reviewed the support for the claims and found the product to be effective.  Because there is no review and authorization process for such claims under DSHEA, this would be deceptive.

## 4. Third Party Literature

Dietary supplement advertisers should be aware that the use of newspaper articles, abstracts of scientific studies, or other "third party literature" to promote a particular brand or product can have an impact on how consumers interpret an advertisement and on what claims the advertiser will be responsible for substantiating.  For purposes of dietary supplement labeling, Section 5 of DSHEA provides an exemption from labeling requirements for scientific journal articles, books and other publications used in the sale of dietary supplements, provided these materials are reprinted in their entirety, are not false or misleading, do not promote a specific brand or manufacturer, are presented with other materials to create a balanced view of the scientific information, and are physically separate from the supplements being sold.

The FTC will generally follow an approach consistent with the labeling approach when evaluating the use of such publications in other contexts, such as advertising.  Although the FTC does not regulate the content or accuracy of statements made in independently written and published books, articles, or other non-commercial literature, FTC law does prohibit the deceptive use of such materials in marketing products.  The determination of whether the

materials will be subject to FTC jurisdiction turns largely on whether the materials have been created or are being used by an advertiser specifically for the purpose of promoting its product. As a practical matter, publications and other materials that comply with the elements of the DSHEA provision, particularly with the requirement that such materials be truthful, not misleading and balanced, are also likely to comply with FTC advertising law.

### Example 36

An author publishes a book on the curative properties of an herb. The book title is "The Miracle Cancer Cure." The book does not endorse or otherwise mention any particular supplement brand. The author/publisher does not sell the herbal supplement and does not have any material connection to any marketers of the herb. As non-commercial speech, the book itself would not be subject to the FTC's jurisdiction over advertising. However, if a marketer of the herb referred to the book in advertising materials (for instance, by quoting the title and using excerpts to describe the anti-cancer benefits of its product), such references would likely be considered advertising. The advertiser would be responsible for substantiating any claims about the advertiser's product that are conveyed by these references.



# CONCLUSION

Marketers of dietary supplements should be familiar with the requirements under both DSHEA and the FTC Act that labeling and advertising claims be truthful, not misleading and substantiated. The FTC approach generally requires that claims be backed by sound, scientific evidence, but also provides flexibility in the precise amount and type of support necessary. This flexibility allows advertisers to provide truthful information to consumers about the benefits of supplement products, and at the same time, preserves consumer confidence by curbing unsubstantiated, false, and misleading claims. To ensure compliance with FTC law, supplement advertisers should follow two important steps: 1) careful drafting of advertising claims with particular attention to how claims are qualified and what express and implied messages are actually conveyed to consumers; and 2) careful review of the support for a claim to make sure it is scientifically sound, adequate in the context of the surrounding body of evidence, and relevant to the specific product and claim advertised.

# Endnotes

[1]  The FTC's authority derives from Section 5 of the FTC Act.  In addition, supplements have traditionally been regulated under Sections 12 and 15, which prohibit false advertisements, defined as those that are "misleading in a material respect," for foods, drugs, devices or cosmetics.

[2]  Under DSHEA, supplement marketers are allowed to make two kinds of claims on labeling:  1) health claims specifically authorized by the FDA; and 2) statements of nutritional support.  Health claims — representations about  the relationship between a nutrient and a disease or health-related condition — are permitted only if they have been authorized by an FDA finding that there is "significant scientific agreement" to support the claim.  The Food and Drug Administration Modernization Act of 1997 (FDAMA) also now allows health claims that are based on "authoritative statements" from certain federal scientific bodies, such as NIH and the National Academy of Sciences.  Aside from these authorized claims, supplement marketers are prohibited from making any labeling claim about the diagnosis, mitigation, treatment or cure of a disease.  In contrast to health claims, "structure/function" claims, within the broader category of "statements of nutritional support," refer to representations about a dietary supplement's effect on the structure or function of the body for maintenance of good health and nutrition.

[3]  Structure/function claims are not subject to FDA pre-authorization.  A marketer may make these claims in labeling if it notifies FDA and includes a disclaimer that the claim has not been evaluated by FDA and that the product is not intended to diagnose, mitigate, treat, cure, or prevent disease.  DSHEA also requires that structure/function claims in labeling be substantiated and be truthful and not misleading.  This requirement is fully consistent with the FTC's standard that advertising claims be truthful, not misleading and substantiated.

[4]  FTC policy statements and other information for businesses and consumers are available on the FTC's Internet home page, **www.ftc.gov**.

[5]  As indicated in the Food Policy Statement, the FTC will be "especially vigilant in examining whether qualified claims are presented in a manner that ensures that consumers understand both the extent of the support for the claim and the existence of any significant contrary view within the scientific community.  In the absence of adequate qualification the Commission will find such claims deceptive."

[6]  These principles are articulated in the FTC's Deception Policy Statement and Advertising Substantiation Policy Statement, available at **www.ftc.gov**.  The FTC also has authority to challenge unfair trade practices.  An unfair practice is one that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition. The majority of advertising cases are brought pursuant to the FTC's deception authority.

[7]  Throughout these examples the terms "advertiser," "marketer," "supplement manufacturer" and "company" are used interchangeably.

[8]  Additional guidance on the use of consumer testimonials is provided in Part C.1.

[9]  Any foreign research submitted to the FTC in the course of an investigation should be presented in English translation and with sufficient detail to allow the agency to evaluate the study.

[10]  The FTC has provided detailed guidance on this subject in its Guides Concerning Use of Endorsements and Testimonials in Advertising, available at **www.ftc.gov**.



Page 35